IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES S. NOLAND,

           Plaintiff,

vs.                                No. CIV 08-56 JB/LFG

CITY OF ALBUQUERQUE, et al.,

           Defendants.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

THIS MATTER comes before the Court on an Order of Reference [Doc. 98], filed June 8, 2010, directing the undersigned Magistrate Judge to submit Findings and Recommended Disposition with respect to the County Defendants' Motion for Summary Judgment [Doc. 94].[2]

Plainitff James S. Noland ("Noland") filed an untimely Response [Doc. 99], along with a Memorandum in Support [Doc. 100]. County Defendants filed a Reply [Doc. 102] on July 9, 2010. For the reasons given below, the Court recommends that the Motion for Summary Judgment be granted and that all of the County Defendants be dismissed from this lawsuit.

---

[1] **Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the 14-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

[2] "County Defendants" include the Bernalillo County Board of Commissioners, Bernalillo County Metropolitan Detention Center ("MDC"), Mike Sisneros, Ronald Torres, Henry Perea, Matt Candelaria, Juan Chacon, Matt Elwell, Paul Salcido, Erin Worsham, Danny Sisneros, and Jose Hernanadez.

## Procedural Background

Noland is proceeding *pro se*.[3]  He filed his initial Complaint in this case on January 15, 2008 and an Amended Complaint [Doc. 4] on March 31, 2008.  He names as defendants the City of Albuquerque, several City of Albuquerque employees, the Bernalillo County Board of Commissioners, MDC, and several County employees.

Noland alleges that he was wrongfully terminated from his employment with the County without due process in violation of 42 U.S.C. § 1983 and Title VII, and that he was discriminated against and retaliated against based on his race and perceived religious affiliation.  He seeks compensatory and punitive damages, attorney fees, a declaratory judgment and injunctive relief. [Doc. 4; Doc. 68, at 1-2].

The County Defendants filed their Answer [Doc. 34] on May 9, 2008, denying that they violated any of Noland's constitutional or statutory rights.  They contend they had a legitimate business reason for terminating Noland's employment, and they assert the affirmative defenses of qualified immunity and Plaintiff's failure to mitigate damages.  They also contend that punitive damages are not recoverable against the County or the individual Defendants in their official capacities. [Doc. 34; Doc. 68, at 3].

Noland brought a separate lawsuit in New Mexico state court, naming the same parties and raising the same issues as in this federal lawsuit.  The state district court initially stayed proceedings on the assumption this Court would decide the state-law issues involved in this case.  Nolan filed a Motion to Clarify [Doc. 59], and United States District Judge James O. Browning entered a

---

[3] Attorney Sidney Childress ("Childress") entered an appearance on behalf of Noland on October 28, 2009.  His request to withdraw as counsel for Plaintiff was approved on June 8, 2010, and Noland is again proceeding *pro se*.

Memorandum Opinion and Order on October 27, 2009, concluding that this Court would not take jurisdiction over any state-law causes of action under the New Mexico Tort Claims Act, as such claims were not brought in the initial or Amended Complaint in this case. [Doc. 69].

On March 19, 2009, Judge Browning entered an Order granting in part and denying in part the County Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, dismissing Noland's procedural due process claims but allowing his claims of discrimination and retaliation to go forward.  [Doc. 54].

On October 27, 2009, the Court denied the County Defendants' Motion for Protective Order and permitted discovery to proceed.  [Doc. 72].  On November 12, 2009, the Court entered a Scheduling Order setting April 26, 2010 as the cutoff date for discovery, with discovery motions due by May 17, 2010. [Doc. 81].  There are currently no discovery motions pending.

The County Defendants filed the instant Motion for Summary Judgment on May 26, 2010. Defendants' certificate of service states that they served the Motion on May 25.  Noland's Response was not filed until June 25, 2010, significantly past the 14-day deadline for responding as provided in Local Rule D.N.M.LR-Civ. 7.4(a).

As noted above, Noland's attorney was allowed to withdraw on June 6, 2010, after which Noland resumed his *pro se* representation. Under these circumstances, the Court would likely have looked favorably on a request for an extension of time to respond.  However, Noland did not file a motion for extension, and there is no indication on the record that he sought an agreement for an extension from opposing counsel.  Instead, he simply filed a late Response.

Under this district's local rules, a party's failure to file and serve a response within the prescribed time constitutes consent to grant the motion.  However, a motion for summary judgment must be analyzed on the merits, even if the opposing party fails to respond in a timely manner.  <u>Reed</u>

v. Nellcor Puritan Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002). The Court therefore considers all of the parties' submissions in making the recommendation set out below.

### Discussion

### Summary Judgment Standards

A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and determine if there is a triable issue. Summary judgment will be granted when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The Court does not decide the issues of fact, but rather determines if there is an issue that must be resolved at trial.

The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment, nor will mere argument or contention of counsel suffice. Fed. R. Civ. P. 56(e); Bacchus

Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

"The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'" Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).  Summary judgment can be entered only if there is insufficient evidence for a reasonable jury to return a verdict for the party opposing the motion.  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.  Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id., at 251-52, 106 S. Ct. at 2512.

The Court in considering a motion for summary judgment construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

### Noland's Request for Further Discovery

In this case, the County Defendants met their burden of presenting evidence sufficient to show the absence of a genuine issue of fact.  Thereafter, the burden was on Noland to come forward with specific facts, supported by admissible evidence, to demonstrate that issues exist that call for a trial.  Noland has not met that burden.

The County Defendants raise six legal arguments in support of their request for summary judgment.  In accord with their obligations under FED. R. CIV. P. 56, they provide affidavits, deposition extracts and other documentary evidence in support of these arguments.  Noland does not provide any evidence at all with his Response; rather, he continues to rely solely on his own unsupported allegations of discrimination.

Noland states in his Response that "the case is too early on in the stage of due process and

is not ripe for summary judgment when all discovery has not been made . . . ." [Doc. 99, at 1]. He

goes on to argue:

> Summary judgment cannot be allowed, because, all discovery has not been made, interrogatories have not been completed and depositions have also not been completed . . . .  The burden of expense on the defendants has been their own since the beginning of this case.  The county has the resource to admit the discovery and the importance of the discovery as well as interrogatories as well as deposition is important to the litigation, because the defendants have complete control over the discovery and the discovery is important in order the go to trial as well if there remain any questions of fact and law . . . . Thus to dismiss this case at this early stage would violate due process and deny this Plaintiff of the protection guaranteed under the Constitution of The United States of America, creating a manifest injustice within our judicial system.

[Id., at 3-4].

    In his Memorandum in Support, Noland states that "Plaintiff can resist summary judgment,

because he can present evidence that proffered reason was pretextual . . . or otherwise introduces

evidence of illegal discriminatory motive." [Doc. 100, at 2].  However, Noland has not presented

such evidence in his Response to the County Defendants' summary judgment motion.  It is not a fact

of consequence that a party may be able to produce evidence on a particular issue at trial.  Rather,

when faced with a meritorious showing of an entitlement to judgment at the summary judgment

stage, an opposing party must come forward with "some concrete showing through the production

of evidence indicating the existence of a genuine dispute."  Jerrold L. Walden, Civil Procedure in

New Mexico 258, 259 (1973).

    Noland states further that "Plaintiff has also raised a genuine issues of material fact to

proceed beyond summary judgment and Plaintiff can perfect this evidence once he is allowed to

complete his discovery that was trotted [sic] by his ineffective attorney." [Id., at 4].  He asks that

he "be allowed to complete his court ordered discover[y], the trial should be reset to allow his

discovery and the Motion for Summary Judgment should be denied."  (Emphasis in original).  [Id.].

Noland appears to be arguing that he was denied an opportunity to engage in discovery and that the Court must reschedule the trial date, and reopen discovery, in order to allow him to obtain information that will assist him in resisting the Motion for Summary Judgment.  He claims that his attorney, who represented him for a period, thwarted his plans for discovery.

If a party faced with a motion for summary judgment feels he cannot adequately respond because further discovery is needed, he is obligated to proceed by way of affidavit under FED. R. CIV. P. 56(f).  It is insufficient to simply request, or demand, further time for discovery.

> Fed.R.Civ.P. 56(f) requires that the party seeking to invoke its protection state with specificity how the additional material will rebut the summary judgment motion.  A party may not invoke Fed.R.Civ.P. 56(f) by merely asserting that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  Rather, the party must demonstrate precisely how additional discovery will lead to a genuine issue of material fact. [Internal citations omitted].

Ben Ezra, Weinstein & Co. v. America Online, Inc., 206 F.3d 980, 987 (10th Cir.  2000).  *See also*, Pasternak v. Lear Petroleum Exploration, Inc., 790 F.2d 828, 833 (10th Cir.1986) ("the opposing party must demonstrate 'how additional time will enable him to rebut movant's allegations of no genuine issue of fact.'")

In this case, Noland failed to submit a Rule 56(f) affidavit.  He has not supplied a description of the particular discovery he intends to seek, demonstrated how such discovery would preclude the entry of summary judgment, nor explained why this discovery could not have been obtained earlier.

> [T]he affidavit submitted by the Garcias' counsel failed to identify any specific facts which would create a genuine issue of material fact, let alone identify what steps had been taken to obtain such facts and a plan for the future. In addition, the Garcias already had six months to conduct discovery prior to their request . . . .

Garcia v. U.S. Air Force, 533 F.3d 1170, 1179-80 (10th Cir. 2008).

As noted above, this case was originally filed on January 15, 2008.  After resolving a number of motions, including denial of County Defendants' Motion for a Protective Order to halt discovery temporarily, the Court conducted a scheduling conference on October 28, 2009.  At this conference, attorney Childress entered an appearance on behalf of Noland.  Up until that time, Noland had been proceeding *pro se*.

On November 6, 2009, Noland's newly-hired counsel filed a Notice [Doc. 75] with the Court stating that all pending motions and outstanding discovery requests, served by Noland while he was representing himself *pro se*, would be withdrawn and that no responses to those motions or discovery requests would be necessary.  On November 10, 2009, counsel certified that he served a first set of interrogatories and requests for production on the County Defendants, and others. [Doc. 78].  The County Defendants certified that they served responses to these discovery requests on December 10, 2009 [Doc. 84], and that they supplemented their responses on January 8, 2010. [Docs. 84, 87].

Noland and his attorney must have been satisfied with those responses, as no motions to compel were filed against the County Defendants (although such a motion was filed with respect to the City Defendants' responses to discovery).  The discovery period ended April 26, 2010, and the time for filing discovery motions expired on May 17, 2010.

On June 4, 2010, Childress filed an Unopposed Motion for Withdrawal as Counsel [Doc. 96], stating that he "entered an appearance in this case for Plaintiff and has investigated Plaintiff's claims.  The undersigned is not obligated to continue the representation and desires to withdraw from further representation." [Id., at 2].  Noland concurred in the withdrawal and further concurred in counsel's statement that Noland intended to proceed *pro se* from that point on.

8

During the period between entry of the Scheduling Order and the date discovery closed, Noland was represented by competent counsel.  Interrogatories and Requests for Production were served by Noland's counsel and answered by the County Defendants.  Attorney Childress took at least two depositions on behalf of Plaintiff, as evidenced by transcripts filed with the Motion for Summary Judgment [*see* Doc. 94, Exs. D, G].

If Noland was dissatisfied with his attorney's performance with respect to discovery, he did not so advise the Court, nor did he request an extension of time to conduct further discovery based assertions that counsel failed to represent him adequately.  He now asks that he be "allowed to complete his discovery that was trotted [presumably meaning thwarted] by his ineffective attorney."  However, the record indicates that counsel was proceeding vigorously and professionally during the discovery period.  Noland has not come forward with any evidence to demonstrate otherwise, nor has he ever requested an extension of time to conduct further discovery, until now.

The request for further discovery is denied for failure to make the specific showing required under Rule 56(f) and <u>Ben Ezra</u>, *supra*.

## Summary Judgment is Appropriate in Favor of the County Defendants

### A. *Undisputed Material Facts*

In their Motion for Summary Judgment, the County Defendants list 46 Undisputed Material Facts.  [Doc. 94, at 2-9].  Noland submitted no affidavit, no deposition testimony, no answers to interrogatories, and no admissions challenging any of Defendants' material facts.  In sum, Noland seeks to rely on his own argument and contention.  This is improper.  Noland does not challenge any of Defendants' facts specifically; instead, he makes the general assertion that "Defendant's undisputed material facts is non-founded, without factual evidence, contradicts itself, is misleading,

untrue, false, with statements of lies and fraud upon this court, and without merit." [Doc. 99, at 2].

Local Rule 56.1(b) provides that a party moving for summary judgment must set out a concise statement of all material facts as to which the moving party contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record that support the facts as stated. The rule goes on to state:

> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).

Noland has not complied with this rule. He does not state specifically which of the 46 Material Facts are in dispute, in his view, nor does he provide any references to the record to support his claim that particular facts are at issue.

Some of the facts set forth in the County Defendants' Motion are referenced to Noland's Amended Complaint; for example, the date he was hired at MDC and his job duties as a case management specialist there. Other facts are referenced to Noland's own deposition. In his blanket condemnation of Defendants' statement of facts, Noland does not acknowledge that many of the facts set forth by Defendants came directly from his own sworn testimony or from his Amended Complaint, filed with a verification pursuant to 28 U.S.C. § 1746 which was signed by Noland and stated his declaration under penalty of perjury that the factual allegations of the complaint were true to the best of his knowledge and belief. *See also*, FED. R. CIV. P. 11(b).

While Noland argues that he wasn't given adequate time to conduct discovery, the parties

were afforded ample time to engage in discovery.  It is also clear that some discovery was conducted by his attorney; however, Noland does not make use of this discovery in his Response and gives the Court no basis on which to conclude that any fact remains in dispute.  The Court thus accepts the Undisputed Material Facts as set out by the County Defendants in their Motion for Summary Judgment, which establish the following:

Noland was hired as a case management specialist at MDC on or about October 29, 2004, at time when MDC was operated by the City of Albuquerque.  As a case management specialist, Noland was responsible for processing inmate housing grievances.  Noland was considered a probationary employee for the first six months of his employment with MDC, meaning he could be terminated at any time, with or without cause. [Doc. 4, at 4; Doc. 94, at 2].

Noland alleges that in November 2004, he requested a temporary badge, which is customary for new employees.  Noland further alleges that in response to this request, Defendant Danny Sisneros, a correctional officer at MDC, told Noland that he "needed to know who runs the jail," and that Sisneros's family members were high ranking officials at MDC.  Noland further alleges that when he reported Danny Sisneros's comments to Major Donald Crutchfield ("Crutchfield"), another Defendant in this case, Crutchfield refused to do anything about the complaint, saying "what do you want me to do?  They are his family."

Noland says that, because of Crutchfield's inaction, he did not make any further complaints and did not file any grievances when he was subjected to further racial slurs, threats of violence, harassment and discrimination.  He says he believed it would be futile to complain, and he was afraid he would be terminated for doing so since he was still a probationary employee. [Doc. 4, at 4-5; Doc. 94, at 3; Doc. 94, Ex. A (v. 1), at 59, 63-64].

Noland testified in his deposition that he felt discriminated against and retaliated against,

11

because members of the Sisneros family received preferential treatment. [Doc. 94, at 3; Doc. 94, Ex. A (v. 2), at 48].

In his Amended Complaint and deposition, Noland recounted instances of alleged racial discrimination at the hands of individual County Defendants.  He alleges that Defendant Ernest Wickham ("Wickham"), a correctional officer at MDC, made racially charged and condescending remarks to Noland on a daily basis.  He alleges that Wickham would shine a flashlight in Noland's office at MDC and say "I can see you now," which Noland took as a discriminatory comment directed at Noland because he is African-American.  Noland also alleges that Wickham made references to the Taliban and "diaper bandits" in his presence, which Noland took as an indication that Wickham believed Noland was Muslim, even though Noland is actually a Baptist. [Doc. 4, at 6; Doc. 94, at 4; Doc. 94, Ex. A (vol. 1), at 50-54, 68-70].

Noland says that he did not file a grievance against Wickham for these behaviors, but that Noland's office mate, Lisa Chavez, made a complaint against Wickham on Noland's behalf and without his knowledge.  As a result of Ms. Chavez's complaint, Noland was called into the office of Defendant Henry Perea ("Perea"), whom Noland identifies as the Deputy Chief at MDC and "part of the Sisneros/Torres cabal."  Noland cannot remember what was said at this meeting or what the outcome of the meeting was; however, he states that after the meeting, Wickham "was supposed to stay away from our area" but continued to come around anyway.  [Doc. 4, at 6; Doc. 94, at 4; Doc. 94, Ex. A (v.1), at 64-70].

Noland stated in his deposition that, in addition to Wickham, several other correctional officers would refer to African-American inmates using derogatory names, including the word "nigger," which made him uncomfortable.  He could not identify any of these correctional officers. He did not file any grievances based on these incidents, he says, because it probably wouldn't have

helped and he was afraid he wouldn't make it past the probationary period if he did.  [Doc. 94, at 5; Doc. 94, Ex. A (vol.1), at 50-52, 59-60].

In addition to his allegations that he was treated in a racially discriminatory manner by MDC employees, Noland also alleges that he was wrongfully terminated from his employment there. [Doc. 4, at 4].

Noland was originally hired as a City of Albuquerque employee.  On July 1, 2006, the County assumed management of MDC from the City.  Prior to the transition, all MDC employees were asked to reapply for their positions if they wished to continue their employment at MDC after the County took over.  The County then screened the applications for qualifications and reviewed the applicants' work performance.  Applicants who had prior performance issues were given a "Conditional Offer of Employment - Agreement."  Applicants receiving this conditional offer were informed that they would be placed on a 9-month "at will" status when they became County employees.  [Doc. 4, at 6; Doc. 94, at 5; Doc. 94, Ex. B at 1, Ex. D at 5-9].

As part of the MDC transition from City to County control, the County adopted a Resolution under which it agreed to employ certain former City employees to work at MDC, "in a manner that is as close to their former wages, hours, benefits, terms and conditions of employment as possible." [Doc. 4, at 6; Doc. 94, at 5; Doc. 94, Ex. C, at 1].  However, the County reserved the right to refuse to hire any City employee with a disciplinary history or performance issues.  As noted above, such applicants could also be given a conditional offer of employment, which meant they would be placed on the 9-month probationary status.  [Doc. 94, Ex. D, at 5-7, 9-12].

In April or May 2006, Noland was informed that he was receiving a conditional offer of employment as a County employee.  He alleges that the conditional offer was the same offer given to employees with extensive disciplinary records, or even with criminal records, which Noland did

13

not have.  In addition, the conditional offer would subject him to a new 9-month probationary period which, Noland alleges, would "tak[e] away his right, terms, and conditions he had as a non-probationary employee."  [Doc. 4, at 6; Doc. 94, at 5; Doc. 94, Exs. E,F].

Defendants state that Noland was given the conditional offer rather than a full offer of employment with the County, because of work performance issues when he was working for the City.  Specifically, he failed to visit his pods in a consistent manner and continued in this failure, even after his supervisor spoke to him about the problem. [Doc. 94, at 6; Doc. 94, Ex. B at 1, Ex. G at 8, Ex. H at 1-2].

Noland says that he contacted Defendant Erin E. Worsham, Human Resources Officer, to ask why he received the conditional offer when everyone else, or at least others similarly situated to him, received full offers.  He also states that he contacted other administrators at MDC to find out why he was not given an offer of employment equal to those applicants who were similarly situated, but he "was never given a direct answer." He says he was pressured into signing the contract of employment under threat that he would be laid off, although he does say who was pressuring him. [Doc. 4, at 7; Doc. 94, at 6].  He signed the offer of employment on June 5, 2006. [Doc. 94, Ex. F].

On June 8, 2006, before the City transferred control of MDC to the County, Noland was involved in an altercation with another corrections officer, Defendant Jose Hernandez ("Hernandez"). [Doc. 4, at 7; Doc. 94, at 7; Doc. 94, Ex. I].

Noland describes the June 8 incident in his Amended Complaint, as follows:  The incident began when Noland called one of the housing units to arrange to have an inmate receive an attorney phone call.  The person at the other end of the line picked up the phone and then hung it up, several times.  Noland then went to the housing unit to investigate and found Hernandez on duty in the unit. Noland alleges that he went up to the desk and asked Hernandez, in a non-aggressive way, what was

14

going on.  He determined that Hernandez was upset because Noland refused to let him use an office computer speaker.  Noland says he then told Hernandez to "stop acting like a bitch." [Doc. 4, at 7].

Noland further contends that Hernandez "was encouraged to file a grievance" against him. Noland does not state who encouraged Hernandez to do this.  He states further that the police were called and a "short report" was taken.  Following the incident, Noland says he was placed on administrative leave, asked to hand over his keys and badge, and was escorted out of the building by supervisors.  No action was taken against Hernandez.  Shortly after this, Noland states that he was informed that the conditional offer of employment was rescinded. [Doc. 4, at 7-8].

In their Undisputed Facts, County Defendants offer a similar version of the incident that led to Noland's termination, referencing the Police Report of June 6, 2006, an Inter-Office Memorandum dated June 9, 2006, and Noland's deposition, among other things.  They state that the altercation started when Noland attempted to call a housing unit, and the person answering the phone hung up on him several times.  Noland then went to the housing unit, found Hernandez there, and realized that Hernandez was angry at him for his refusal to allow Hernandez to borrow some speakers.  Words were exchanged, and Noland told Hernandez to "stop acting like a bitch."  Noland testified in his deposition that there was no physical contact, only a verbal exchange.  He says he went home, and when he returned to work the next day discovered that the police had been called, because Hernandez said he was afraid of Noland.  [Doc. 94, at 7; Doc. 94, Ex. A (v.1), at 126-127; Exs. I, J, K].

The June 6, 2006 Police Report of the incident stated that the Sheriff's Department officer was dispatched to MDC in reference to a verbal argument between two employees.  The officer took a written statement which said that Noland "got inches" from Hernandez.  The report was filed and no further action was taken by the Sheriff's Department. [Doc. 94, Ex. J, at 2].

15

In a June 9, 2006 Inter-Office Memorandum, Sergeant Iran Rodriguez reported to Captain Juan Chacon on the incident.  He wrote that Noland entered the unit and started cursing at Hernandez and threatening to inflict physical harm on him after work hours.  Shortly after the confrontation, Noland left MDC for the day.  The sergeant reported that both Hernandez and Noland submitted written statements. [Doc. 94, Ex. I].

In his statement, Hernandez acknowledged hanging up the phone on Noland twice that day, after which Noland entered his pod and "ran up to him and started cursing at him."  Hernandez further stated that Noland "kept grabbing at his genital area and stating that he was going to meet him in the parking lot after work to see who the bigger man was."  In his statement, Noland said he initially went to the pod to investigate what he thought might be an "incident," after the phone was hung up more than once when he was trying to call.  He said he entered the pod and approached Hernandez, told him he was being rude and asked what was going on.  Noland agreed that words were exchanged, and "he explained to Officer Hernandez that he was weak." The report noted further that Noland "has no more to say about the incident except personal feelings concerning Officer Hernandez."  [Doc. 94, Ex. I, at 1].

Sergeant Rodriguez concluded that Hernandez acted inappropriately in hanging up on Noland, and that Noland acted inappropriately by cursing at Hernandez and threatening him with acts of violence and physical harm.  Noland was escorted out of the facility after the incident and placed on administrative leave while the incident was investigated. [Id., at 2].  Chief Ronald C. Torres notified Noland in writing on June 9, 2006 that upon conclusion of the investigation, he could face discipline, up to and including termination.  [Doc. 94, Ex. K].

Noland's conditional offer of employment was rescinded and he was terminated on June 28, 2006.  The termination was based on the County's zero-tolerance Workplace Violence Policy, the

16

results of the investigation of the incident, and the fact that Noland had been given a conditional offer of employment. Michael Martindale, Senior Human Resources Administrator for the County, reported to the EEOC that all reported violations of County policy have been investigated and disciplined accordingly. [Doc. 94, at 8; Doc. 94, Ex. B].

In his deposition, Noland testified that several other African-American employees at MDC were given a 9-month probationary period, while Hispanic employees with criminal histories and serious disciplinary histories were given a regular offer of employment. [Doc. 94, at 8; Doc. 94, Ex. A (v.1), at 98]. Defendants submitted evidence showing that, in reality, out of 35 individuals receiving the 9-month probationary period, four were African-American, and all of these individuals had performance issues or disciplinary problems. [Doc. 94, at 8; Doc. 94, Ex. D at 19-20, Ex. O].

Following his termination, Noland filed EEOC Charges of Discrimination against the City and the County. Noland alleged in these Charges that he was discriminated against based on his race and religion, and retaliated against because he complained of discrimination. He stated that the incident with Hernandez involved only a verbal confrontation, and that he is aware of MDC employees who were involved in fisticuffs and who have criminal backgrounds who were offered positions with the County. [Doc. 94, at 8; Doc. 94, Exs. M, N].

Noland received an Order of Nondetermination from the State Department of Workforce Solution on April 9, 2008. [Doc. 94, at 8; Doc. 94, Ex. P].

B. *County Defendants Are Entitled to Summary Judgment in Their Favor*

County Defendants raise six legal arguments in support of their Motion. The undisputed material facts, set forth above, establish their entitlement to summary judgment, and Noland's Response is insufficient to raise a genuine factual or legal issue for trial.

1.  <u>Preferential Family Treatment</u>

County Defendants argue that, to the extent Noland claims he was retaliated and discriminated against because individuals related to the Sisneros family received preferential treatment at MDC, that claim was not raised in his Charges of Discrimination filed with the EEOC and therefore it remains unexhausted.  Defendants further argue that, even if the claims were exhausted, Noland failed to show that any individual related to the Sisneros family in fact received preferential treatment; and in any event, nepotism, even unfair nepotism, does not raise an inference of pretext or racial discrimination.

In <u>Neal v. Roche</u>, 349 F.3d 1246, 1251 (10th Cir. 2003), the court referred to the "'friendship' and 'nepotism' cases," noting:

> These cases hold that an employer's actions based on loyalty to a friend or relative . . . are not considered "discriminatory," even where they benefit the nonprotected friend or relative at the expense of a more qualified, protected person. *See, e.g.*, . . . Foster v. Dalton, 71 F.3d 52, 54, 56 (1st Cir.1995) (upholding, against Title VII challenge, supervisor's decision to alter job description to favor his "fishing buddy" over generally more qualified black female applicant, because "Title VII does not outlaw cronyism") . . . .

Indeed, the court continued, employers are free to use whatever criteria they want in hiring or firing, even criteria that are "unfair" or reprehensible, so long as they are not discriminatory. Personal or political favoritism, even a grudge, may account for an employment decision without giving rise to a discrimination case.  <u>Id.</u>, at 1252.

"Title VII only prohibits discrimination on the basis of certain, invidious factors. Employers are free to terminate at-will employees for any other reason – however unfair, unwise, or even erroneous – so long as it is not unlawful."  <u>Adamson v. Multi Community Diversified Servs., Inc.</u>, 514 F.3d 1136, 1153 (10th Cir. 2008).

Thus, even if Noland had exhausted this claim, and even if he demonstrated that members of the Sisneros family received preferential treatment, that would not give rise to an action under Title VII.

### 2. Discrimination and Retaliation Based on Race and Religion

Noland claims that he suffered disparate treatment at MDC because of his race and perceived religion (Noland says that comments directed at him indicate that some co-workers thought he was Muslim, although he is actually a Baptist). He claims that his termination was motivated by race and religion rather than for permissible business reasons, and/or by a desire to retaliate against him.

Title VII prohibits an employer from dischargting any individual because of his race or religion. 42 U.S.C. § 2000e-2(a)(1). A plaintiff claiming racial discrimination may prove his case by presenting direct evidence of discrimination or, if such evidence is not available, the Court will apply the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), discussed below.

Noland does not present sufficient direct evidence to establish a case of racial or religious discrimination. He alleges that some County employees used derogatory names to refer to African-Americans, including the word "nigger." However, he cannot identify any particular correctional officer or other employees who used these terms. Nor does he provide any evidence that the use of racial epithets by co-employees was ever brought to the attention of any supervisor.

Noland also stated that Defendant Wickham made racist jokes in Noland's presence (for example, shining a flashlight in Noland's office and saying "now I can see you," and commenting that Noland didn't need any additional chocolate), and made jokes and comments referring to the Taliban, Muslims and "diaper bandits"). [Doc. 94, Ex. A (v.1), at 50-52, 65-66, 70]. Noland also testified in his deposition that Defendant Matt Candelaria ("Candelaria") "would come to me and

ask me for information regarding Ramadan and things that have to do with Muslims, because I had worked at the penitentiary." [Doc. 94, Ex. A (v.1), at 70].  Noland thinks that the rumor that he was a Muslim may have arisen from Candelaria's questions about Islam.

This testimony does not establish that Candelaria had any sort of discriminatory animus or motive against Noland based on his religion, real or perceived.  For all that Noland's testimony tells us, Candelaria may have been asking about Ramadan so that he could better serve Muslim inmates at MDC.  County Defendants further point out that Wickham is being sued in his capacity as a City employee and is not one of the County Defendants.  Noland does not provide any other direct evidence that he was discriminated against because of his race or perceived religion.

Without direct evidence of discrimination, the Court will apply the McDonnell Douglas framework to examine whether Noland presents sufficient circumstantial evidence of discrimination to avoid summary judgment.  Under this scheme, the plaintiff must first establish a *prima facie* case of discrimination.  The burden imposed on a plaintiff at the *prima facie* stage is "not onerous."  Ortiz v. Norton, 254 F.3d 889, 895 (10th Cir. 2001), *citing* Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

A plaintiff alleging discrimination on the basis of race or religion must typically show: (1) he belongs to a protected class; (2) he was qualified for his job; (3) he was terminated despite his qualifications; and (4) the job was not thereafter eliminated.  Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 n.3 (10th Cir. 2006).

If the plaintiff carries his burden and establishes a *prima facie* case, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for the adverse employment action.  Antonio, at 1181.  At this point, the defendant is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."  EEOC v. Flasher Co., 986 F.2d 1312,

1317 (10th Cir. 1992).

If the defendant carries that burden, the presumption raised by the *prima facie* case disappears, and the burden shifts back to the plaintiff to present evidence that the employer's stated reason is a pretext for a discriminatory motive.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  A plaintiff demonstrates pretext by showing either that discriminatory intent more likely motivated the defendant, or that the proffered explanation is "unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003).  Generally, "isolated racial comments" are insufficient to show pretext unless they are linked to the particular adverse employment action which prompted the lawsuit.  EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 489 (10th Cir. 2006).

Pretext can also be demonstrated by evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, 108 F.3d 1319, 1323 (10th cir. 1997).

Evidence of pretext may include "prior treatment of [the employee]; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (*e.g.*, falsifying or manipulating . . . criteria); and the use of the subjective criteria." Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005).  Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.  Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir.1988).

The plaintiff's burden, therefore, is to make two factual showings: the *prima facie* case, and sufficient evidence of pretext to avoid summary judgment.  Defendant's burden is to articulate a

nondiscriminatory reason for terminating the plaintiff. Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999) ("When the McDonnell Douglas analysis is utilized, the burden of production shifts from plaintiff to defendant and back to plaintiff . . . . The ultimate burden of proving discrimination, however, is borne by the plaintiff").

Even assuming that Noland made out a *prima facie* case of discrimination, County Defendants met their burden of showing a legitimate, non-discriminatory reason for terminating Noland, and Noland failed to establish that this reason is pretextual.

The County contends that its conditional offer of employment to Noland was rescinded because Noland violated the County's "zero-tolerance" policy against violence in the workplace. While Noland asserts that there was no physical contact between him and Hernandez during the verbal altercation that led to his termination, he acknowledges that he approached Hernandez at his workplace post and told Hernandez to "stop acting like a bitch," and that thereafter the two men exchanged words. The Police Report of the incident includes a statement by a witness, who said that Noland "got inches" from Hernandez, and an internal investigation concluded that Noland threatened to inflict physical harm on Hernandez after work. In his written statement in connection with the investigation, Hernandez said that Noland ran up to him and started cursing at him, and that Noland kept grabbing his genital area and stating that he was going to meet him in the parking lot after work "to see who the bigger man was." Noland told the internal investigation that "he explained to Officer Hernandez that he was weak."

The County Defendants' Undisputed Material Fact No. 39 states that the internal investigation determined that Noland inappropriately threatened Hernandez by making verbal and physical threats against him. As noted above, Noland does not specifically refute this factual assertion, except insofar as he claims the County Defendants' entire statement of facts is "non-

founded, without factual evidence, contradicts itself, is misleading, untrue, false, with statements of lies and fraud upon this court, and without merit." Nowhere in his Response does Noland specifically deny that he threatened to inflict physical harm on Hernandez.

Even if Defendants were mistaken about Noland's threats against a co-worker, our circuit law is clear. When an employee is terminated by an employer out of a belief, albeit mistaken, that the employee engaged in misconduct, the employer's motivation was the mistaken belief and not the employee's protected status. Thus, there is no violation of Title VII. Tesh v. U.S. Postal Serv., 349 F.3d 1270, 1273 (10th Cir. 2003), *citing* Tatum v. Phillip Morris, No. 93-6018, 1993 WL 520983 (10th Cir. Dec. 14, 1993).

In addition, at the time of the altercation with Hernandez, Noland was working under a conditional offer of employment, based on past work performance problems. Noland agreed to accept employment under the condition that he was a probationary employee. Thus, he had no right to any hearing or to termination only for cause. He was subject to discharge at any time during his probationary period. The County Defendants present evidence to show that they conducted an investigation, determined that Noland violated County policy against workplace violence, and terminated him for that reason. They have therefore met their burden of demonstrating a legitimate non-discriminatory reason for terminating Noland's employment.

The burden shifts back to Noland to present evidence showing a genuine issue of fact as to pretext. He can do this by showing weaknesses, implausibilities or inconsistencies in the County Defendants' proffered reasons for firing him. Noland has not made such a showing. The County Defendants assert that Noland was fired for making threats of physical violence against another employee at the workplace, actions which violate County policy. No jury would find this an invalid reason for firing an employee, and Noland has not demonstrated that the facts as described were so

implausible as to imply a discriminatory motive. Furthermore, the County Defendants have consistently offered this reason for the adverse employment action.

A Title VII plaintiff may also demonstrate pretext by showing that he was treated differently from other similarly-situated employees who also violated work rules. Noland makes this allegation, but he provides nothing to support it. County Defendants have produced evidence to show that Noland was given the conditional offer of employment under a probationary period, because of past work performance issues. Noland does not present evidence to refute this contention; indeed, he does not deny that his prior work performance deficits occurred.

County Defendants also produced evidence that other individuals who received conditional offers had work performance issues, or disciplinary issues, similar to Noland's. In addition, Noland fails to present evidence demonstrating that specific employees who were involved in workplace violence, or threats of violence, were treated differently.

Noland also contends that Defendants had a retaliatory motive in terminating his employment. To establish a claim of retaliation under the McDonnell Douglas analysis, Plaintiff can make out a *prima facie* case by showing: (1) he engaged in protected opposition to Title VII discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. Meiners v. Univ. of Kansas, 359 F.3d 1222, 1229 (10th Cir. 2004). If Plaintiff makes the *prima facie* showing, Defendant must proffer a legitimate, nonretaliatory reason for the termination. Plaintiff then has the burden of demonstrating that Defendant's asserted reasons for the termination are pretextual. Fye v. Oklahoma Corp. Comm'n, 516 F.3d 1217, 1227 (10th Cir. 2008).

Noland fails to make out a *prima facie* case of retaliation. He contends that retaliation occurred because he complained of discrimination. The only incidents on the record of Noland's

having lodged complaints are his statement that he reported to Major Crutchfield Danny Sisneros's comments that his family "runs the jail"; and his meeting with Henry Perea in which he was called in as a witness when another employee lodged a complaint related to racial harassment.  Noland says further that he didn't file grievances because he thought it wouldn't do any good.  He simply hasn't shown that he "engaged in protected opposition to Title VII discrimination."

Even if Noland had made out a *prima facie* case, Defendant brought forward evidence that there was a legitimate non-discriminatory reason for Noland's termination, and Noland did not meet his burden of showing that the proffered reason was pretextual.  McDonnell Douglas.

### 3.  Hostile Work Environment

County Defendants also argue that Noland fails to demonstrate a genuine issue of fact material as to his contention that he was subjected to a hostile work environment.

> Although hostile work environment is not explicitly mentioned in Title VII, it is well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e-2(a)(1) . . . .  For [plaintiff's] harassment claim to survive summary judgment, . . . it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable. The plaintiff must show more than a few isolated incidents of racial enmity.  Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.    [Internal punctuation and citations omitted].

Bolden v. PRC, Inc., 43 F.3d 545, 550-51 (10th Cir. 1994).

Noland asserts that he was subjected to derogatory racial comments by Correctional Officer Wickham, including the flashlight incident and comments about the Taliban and "diaper bandits." Noland states that he didn't complain about these incidents, although his office mate found them sufficiently offensive that she lodged a complaint.  Noland was called in to give a statement on the

complaint, but he can't remember what was said in the meeting or what the outcome was.  He also states that some Defendants used the word "nigger" when referring to African-American inmates, but he can't remember specifically what was said, nor who made the comments.

While such language is reprehensible, Noland fails to demonstrate an issue of fact as to whether he suffered harassment that was a constant barrage and so "pervasive or severe enough" that it "alter[ed] the terms, conditions, or privilege of employment."  Bolden, at 551.

### 4.   Disparate Impact

In addition to bringing a disparate treatment claim, Noland also appears to argue that MDC's actions in terminating several employees during the transition from City to County control had a disparate negative impact on African-Americans, himself included.

In a disparate-impact claim the plaintiff is challenging an employment practice that is "fair in form, but discriminatory in operation." Carpenter v. Boeing Co., 456 F.3d 1183, 1187 (10th Cir. 2006).  The Plaintiff can establish a prima facie case of disparate impact discrimination by showing that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group.  Id..  Noland has not made such a showing in this case.

Noland asserts that more African-American employees received conditional offers of employment during the City-to-County transition than any other race.  He provides no evidence to support this assertion.  Defendants presented evidence to show that of the 35 employees who were given conditional offers, 19 were Hispanic, 7 were Caucasian, and 4 were African-American. Noland does not present any evidence to demonstrate that these numbers are incorrect, or that they indicate that African-American employees were impacted disproportionately to their numbers in the workforce.

### 5. Equal Protection

County Defendants also contend that Noland failed to raise an issue of fact regarding any violation of his Equal Protection rights. They argue that an individual bringing a claim as a "class of one" must show that he has been intentionally treated differently from similarly situated individuals, and that the difference in treatment was objectively irrational. They assert that and that Noland has not made such a showing.

The Court agrees. In any event, the Supreme Court recently made clear that "the class-of-one theory of equal protection has no application in the public employment context." Engquist v. Ore. Dep't of Agric., 553 U.S. 591, 128 S. Ct. 2146, 2156 (2008).

> Thus, the class-of-one theory of equal protection–which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review–is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

Engquist, 128 S. Ct. at 2155.

### 6. Qualified Immunity

Because Noland failed to demonstrate that any of the individual County Defendants violated his constitutional or statutory rights, he cannot overcome the individual Defendants' assertion of entitlement to qualified immunity. Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 815-16 (2009).

## **Recommended Disposition**

That County Defendants' Motion for Summary Judgment be granted, and the following Defendants be dismissed from this lawsuit: Bernalillo County Board of Commissioners, Bernalillo

County Metropolitan Detention Center, Mike Sisneros, Ronald Torres, Henry Perea, Matt Candelaria, Juan Chacon, Matt Elwell, Paul Salcido, Erin Worsham, Danny Sisneros, and Jose Hernanadez.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge